# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 6748 | **DATE** | 12/22/2004 |
| **CASE TITLE** | | Shaw vs. Klinkhamer, et al. | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, defendants' motion for summary judgment [28-1] is granted. Judgment is entered in favor of the defendants and against the plaintiff. All future dates, including the trial date of 1/5/05, are stricken. Plaintiff's motion to supplement the "parties' proposed amended pre-trial order amendments" and to strike certain individuals contained in defendants' witness list is denied as moot. Defendants' emergency motion to continue trial denied as moot. Case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | 2 number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | DEC 2 3 2004 date docketed | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | rbf docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| MD | courtroom deputy's initials | 12/22/2004 date mailed notice | |
| | | MD | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

**DOCKETED**

**DEC 2 3 2004**

DONALD SHAW,  )
)
Plaintiff,  )
)  No. 03 C 6748
vs.  )
)  Judge Joan H. Lefkow
Mayor SUSAN KLINKHAMER, LARRY  )
MAHOLLAND, and THE CITY OF ST.  )
CHARLES, ILLINOIS  )
)
Defendants.  )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Donald Shaw ("Shaw"), brings this action pursuant to 42 U.S.C. § 1983 alleging

that his former employer, the City of St. Charles, Illinois ("St. Charles"), Mayor Susan Klinkhamer

("Klinkhamer"), and City Administrator Larry Maholland ("Maholland"), conspired to violate and

violated Shaw's constitutional rights by terminating him from his position as chief of police of St.

Charles in retaliation for exercising his First Amendment rights. Shaw also asserts state law claims

of retaliatory discharge and respondeat superior, and he seeks indemnification against St. Charles

in the event that judgement is entered against Klinkhamer or Maholland. This court has jurisdiction

pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331, and 28 U.S.C. § 1367. Presently before the court

is the defendants' motion for summary judgment. For the reasons stated below, the defendants'

motion is granted.

### SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

To determine whether any genuine fact exists, the court must pierce the pleadings and assess the



proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). At the same time, "[a] legally sufficient amount of evidence need not be overwhelming, but it must be more than a 'mere scintilla.'" *Filipovich* v. *K & R Exp. Systems, Inc.* 2004 WL 2794941, *3 (7th Cir. 2004).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF

I.    Background

Shaw has served as a member of the St. Charles Police Department since 1981. Beginning as a patrol officer, Shaw was promoted through the ranks to sergeant, followed by deputy chief. In 1991, Shaw was appointed to chief of police by St. Charles' mayor, Klinkhamer, and was reappointed annually in 2000, 2001, and 2002. As chief of police, Shaw served under Klinkhamer and the city administrator, Maholland. On February 18, 2003, Maholland informed Shaw that he

would not recommend his reappointment as chief of police. Following his non-reappointment in May of 2003, Shaw served as acting chief of police until September 15, 2003. Shaw currently holds the rank of sergeant.

In 1997, Klinkhamer was elected mayor of St. Charles and re-elected in 2001. She has held that position continuously since 1997. Maholland is St. Charles' city administrator. Like Klinkhamer, he has held his position continuously since 1997. Maholland is the first city administrator for St. Charles. Before 1997, St. Charles was governed by a mayor/council form of government.

Pursuant to an ordinance of St. Charles, the mayor of St. Charles directly appoints the chief of police for annual terms. Specifically, Section 2.32.020(B) of the St. Charles Code provides: "The chief of police shall be appointed by the mayor for the term of one year or until his or her successor is appointed, commencing May 1 of each year, with such appointment to be confirmed by the city council." (Def. L.R. 56.1, Ex. F at 000109). The city council has the authority to confirm or deny the mayor's recommended appointments.

## II.    Shaw's Performance as Chief of Police

During his tenure as chief of police, Shaw received yearly performance evaluations. The performance evaluations used a rating system in which a score of 3.0 meant "exceeds expectations" and a score of 4.0 meant "outstanding." Pl. L.R. 56.1 Add'l Facts at ¶ 10. Shaw received a score of 3.7 out of 4.0 in his FY 2000/01 performance evaluation and a score of 3.1 out of 4.0 in his FY 2001/02 performance evaluation. In Shaw's FY 2001/02 performance evaluation, which was conducted nine months before he was informed that he would not be reappointed as police chief,

3

Maholland noted that Shaw was "an excellent representative of the City" and that he had received "many favorable comments" about Shaw. Pl. L.R. 56.1 Add'l Facts at ¶¶ 10-12.

The 2002 performance evaluation also noted areas for improvement in Shaw's performance. For example, the performance evaluation states, "Don sometimes makes decisions without gathering input from all parties involved in the decision. While his decisive nature should be admired, he needs to be a little more discerning about when to be decisive." Def. L.R. 56.1, Ex. CC at 195. The performance evaluation also noted that Shaw did not follow through on some of Maholland's recommendations and that Shaw had demonstrated poor communication skills in several instances. Notably, the evaluation also stated that Maholland felt that Shaw "need[ed] to moderate some of his actions when trying to uphold" his "high ethical standards." Pl. L.R. 56.1 Add'l Facts at ¶ 12.

St. Charles also conducted a survey of all full and part-time city employees in 2002. The survey showed an increase in the police department's scores between the years 2000 and 2002 in the categories of police department management, coordination of departments, ownership and pride of work, pay and benefits, freedom to do work and the quality of the work environment, and perception of job. The citywide average for all city departments in many of these categories decreased during the same period. Although showing improvement, the police department scored the lowest out of all city departments in terms of relationship with management, performance appraisal, understanding city policies and purpose, and tied for the lowest rating for ownership and pride of work. Overall, the city ranked below the city's average in all categories except the perception of job category. Maholland also received comments in the employee survey from police officers who expressed concern over where the police department was, where it was going, and how decisions were made. Def. L.R. 56.1 at ¶ 202.

The police department fared well in the city's 2002 and 2003 Priorities Survey, which measured the satisfaction of a cross-section of St. Charles residents with all areas of St. Charles' government. This survey showed that citizens were increasingly satisfied with the police department in all areas except traffic enforcement and parking laws. Similarly, St. Charles business-owners ranked the police department among the top three city services in satisfaction in a 2002 business retention survey. The police department also scored very high in its 2002 and 2003 Resident Interaction surveys.

In November of 2001, Maholland began conducting listen and learn surveys in which he interviewed St. Charles police officers about various aspects of their job and job satisfaction as police officers for St. Charles. This survey was not completed until December of 2003. During the listen and learn sessions, some of the police officers expressed dissatisfaction with the police department in terms of poor morale, office politics, and interpersonal conflicts, as well as the lack of direction of the police department. Maholland took those interviews that he had conducted prior to Shaw's 2002 performance evaluation, which occurred in May of 2002, into consideration in evaluating Shaw for that period. At the time Maholland notified Shaw of his non-reappointment, Maholland had yet to conduct approximately 30-40% of the listen and learn interviews.

III.   **Shaw's Speech**

   *A.   The Courser Citation*

On July 23, 2002, Charles Parker ("Parker"), a St. Charles police officer, stopped Dean Courser ("Courser"), a local St. Charles businessman, for speeding and for failing to have a front license plate on his car. Parker gave Courser a citation for failure to display a front license plate. Courser, a major donor to Klinkhamer's campaigns and the only local merchant with whom

Klinkhamer had monthly one-on-one meetings, subsequently contacted Klinkhamer to discuss his ticket. Courser also contacted Klinkhamer's husband, Dan Klinkhamer, a police officer with the St. Charles police department. Courser and Klinkhamer discussed the citation on more than one occasion. Klinkhamer told Courser that she had spoken with the city attorney, Tim O'Neil ("O'Neil"), about the ticket and that it would likely be thrown out. She also advised Courser to go to court and that the ticket would be dismissed if he demonstrated compliance.

A few days after Courser received his citation, Klinkhamer contacted Shaw, telling him that she "didn't like it" and that she wanted him to "pull it." Pl. L.R. 56.1 Add'l Facts at ¶ 70. This was the first time that Klinkhamer ever requested Shaw's assistance in pulling a ticket or complained about tickets for failure to have a front license plate. Shaw refused to interfere with the prosecution of Courser's citation, informing Klinkhamer that such matters were within the discretion of the ticketing officer. Def. L.R. 56.1, Ex. A at 240-43.

Shortly after his conversation with Klinkhamer, Shaw telephoned Maholland to inform him about his conversation with Klinkhamer.[1] Shaw told Maholland that he should know about the ticket, that Klinkhamer was not happy with the ticket, and that she wanted him to pull it. Def. L.R. 56.1, Ex. A at 246-48. In response, Maholland asked Shaw what he had done. Shaw informed Maholland that he had not pulled the ticket. There were no further conversations between Shaw and Maholland about this incident. Shaw subsequently informed Kathy Livernois ("Livernois"), director

---

[1] Although Shaw stated during his deposition that he did not recall when this conversation took place other than it was before he was informed he would not be reappointed, *see* Def. L.R. 56.1, Ex. A at 247, both parties appear to agree that it took place "shortly after" Shaw's conversation with Klinkhamer. *See* Def. L.R. 56.1 at ¶ 96; Pl. L.R. 56.1 Add'l Facts at ¶ 72.

of the St. Charles Department of Human Resources, of his conversation with Klinkhamer on or about January 8, 2003 in order to make her aware of the conversation. Def. L.R. 56.1, Ex. A at 249-50.

### B.    McNally's Irish Pub

As mayor, Klinkhamer also serves as the St. Charles Liquor Commissioner. In that capacity, Klinkhamer presides over liquor hearings, enforces the liquor code, disciplines violators of the liquor code, and issues liquor licenses. For first time liquor code violators, Klinkhamer generally would give a $1,000 fine and close the establishment down on a day that would "hurt." Pl. L.R. 56.1 Add'l Facts at ¶ 30. As chief of police, Shaw appeared before the St. Charles Liquor Commission to ensure that the liquor code was enforced, but he had no role in the actual adjudication of complaints.

On August 5, 2002, two bars were cited for serving alcohol to underage patrons, Scotland Yard and McNally's Irish Pub ("McNally's"). Klinkhamer subsequently informed Shaw that she was displeased with the liquor compliance investigation involving McNally's because the McNallys were "great people' and that McNally's was "a big part of downtown." Pl. L.R. 56.1 Add'l Facts at ¶ 26. Klinkhamer also stated that she did not like the city's resources to be used in that fashion. Def. L.R. 56.1, Ex. A at 170. Maurice and Kathleen McNally, officers and part-owners of McNally's, had contributed $2,000 to Klinkhamer's re-election fund in 2001. Their contribution was the largest cash contribution that Klinkhamer received in that year.

At its liquor violation hearing held on September 27, 2002, Scotland Yard pled guilty and received a fine of $1,000. In addition, Scotland Yard was closed on Sunday, October 6, 2002, which was the final day of St. Charles' largest festival, the Scarecrow Festival. This festival, which brings approximately 100,000 visitors to St. Charles over the course of a weekend, is non-alcoholic. As

7

a result, people gravitate to bars during the festival. This punishment was consistent with Klinkhamer's intention to close the establishment down on a day that would "hurt."

McNally's also was supposed to have a hearing for its liquor code citation on September 27, 2002 but was granted a continuance. On October 14, 2002, O'Neil, the city attorney, sent a letter to McNally's attorney with an enclosed proposed Settlement Agreement that allowed McNally's to choose a Monday in October to close. After receiving no response, O'Neil sent a letter on November 11, 2002 asking that McNally's attorney telephone him because he had not yet received a response and that Scotland Yard was "grousing" because McNally's had not yet been punished. Pl. L.R. 56.1 Add'l Facts, Ex. O. Klinkhamer ultimately agreed to McNally's proposal of a $1,000 fine and closing on Thanksgiving Day. McNally's then requested that it be allowed to remain open until 1:00 a.m. the morning of Thanksgiving Day rather than the stated requirement that McNally's close at 11:59 p.m. the night before. Klinkhamer agreed to this request. McNally's was not traditionally open on Thanksgiving Day until 4:00 p.m. In December of 2002, O'Neil informed Shaw of McNally's punishment. Laughing, O'Neil rhetorically asked, "How does [Klinkhamer] get away with this?" Pl. L.R. 56.1 Add'l Facts at ¶ 50.

A day or two after speaking with O'Neil, Shaw telephoned Maholland and informed him that McNally's was closed on Thanksgiving Day. At that time, Shaw was under the impression that McNally's was not open on Thanksgiving Day generally. Shaw thought that by agreeing to McNally's proposal, Klinkhamer was demonstrating "extreme favoritism" that "would cause problems." Def. L.R. 56.1, Ex. A at 190-91. In addition, Shaw suspected that McNally's owners were contributors to Klinkhamer's campaigns; however, Shaw did not report this concern or inquire about his suspicion to Maholland during their telephone conversation.

8

## C.    Shaw's Investigation into the Courser Citation

On August 15, 2002, Parker, the police officer who issued Courser's traffic citation, attended

court. That same day, Courser appeared in court concerning his citation. While in court, Parker saw

Dan Klinkhamer speaking with Cecil Porter ("Porter"), the Assistant State's Attorney assigned to

Judge Janes' courtroom, the same courtroom in which Courser appeared.

A few weeks later, Parker learned that Courser's traffic citation had been *nolle prossed*. He

subsequently spoke with Porter in order to learn what happened with the Courser citation. It was

Parker's understanding that he would have to be informed of or involved in the resolution of the

citation. It is the standard practice of the Kane County State's Attorney's Office to notify a

complaining officer if a ticket is *nolle prossed*.

For traffic citations, Judge Janes would ask the Assistant State's Attorney whether or not a

case would be *nolle prossed.* Pl. L.R. 56.1 Add'l Facts at ¶ 86. Judge Janes would not proclaim *sua*

*sponte* that a case would be *nolle prossed* because he lacked the authority to do so. *Id.* Only

Assistant State's Attorneys may *nolle prosse* a ticket. *Id.* If a person demonstrated to the court that

he or she was in compliance with the matter for which he or she had been cited, the Assistant State's

Attorney would determine compliance and inform the person that they could leave. *Id.* at ¶ 87.

Judge Janes would not sign off on such matters until after his court call and after the Assistant

State's Attorney had checked for compliance. Porter did not recall if he discussed *nolle-ing* a St.

Charles ticket or if he spoke with Officer Parker. *Id.* at ¶ 88. As of the date of his deposition in the

present matter, Courser still did not have a front license plate on his car.

After returning from two separate leaves of absence, Shaw asked Parker about the Courser

citation and its disposition. Because he considered the manner in which the ticket had been disposed

suspicious, Shaw promised Parker that he would launch an investigation into the citation. On January 8, 2003, Shaw sent a letter to Meg Gorecki ("Gorecki"), the Kane County State's Attorney, in which he requested information as to how the citation was handled so that he could communicate the information to Parker. *See* Def. L.R. 56.1, Ex. K. This was the first such request for an investigation that Gorecki had received from a police chief.

On January 29, 2003, Shaw asked Dennis Harrison ("Harrison"), an attorney, to investigate the disposition of the Courser citation. Shaw informed Harrison that the ticket had been dismissed without the complaining officer being contacted or questioned about whether the ticket should be dismissed. Def. L.R. 56.1, Ex. Q at 21. That same day, Shaw drafted a Personnel Order, which stated the citation and complaint number of Courser's citation without naming Courser. The Personnel Order further stated that the citation had been dismissed without Parker's consent by an unknown member of the St. Charles Police Department through an unknown Assistant State's Attorney. Def. L.R. 56.1, Ex.O. The Personnel Order also noted that Harrison would conduct a formal investigation into the matter with a completion date of February 28, 2003. *Id.* Maholland, Livernois, and Harrison received copies of the Personnel Order.

On February 3, 2003, Shaw sent a letter to Major Joseph Gryz of the Illinois State Police ("ISP") requesting that the ISP conduct a criminal investigation into the allegation by a member of the St. Charles Police Department that an Illinois traffic citation was dismissed without the consent of the issuing police officer. Def. L.R. 56.1, Ex. R. The letter stated:

> It is alleged by Officer Charles Parker that Illinois Citation and Complaint Number 118861 was issued to Mr. Dean Courser on July 23, 2002. This citation was subsequently nolle prossed on August 15, 2002. According to a statement by

Officer Parker, this citation was dismissed through the actions of an unknown St. Charles police officer. If this is true, this would fall under the obstruction-of-justice statute."

*Id.* Major Gryz spoke with Shaw about the dismissal of the traffic citation after receiving this letter. Shaw informed Major Gryz that he suspected that the dismissal involved political influence and Klinkhamer's office. Pl. L.R. 56.1 Add'l Facts at ¶ 120. Major Gryz told Shaw that his office would not investigate the matter.

## IV.     Shaw is Not Reappointed as Chief of Police

As the city administrator, Maholland made recommendations to the mayor and city council about appointments and reappointments of city personnel. In December of 2002, Maholland reached the decision that he would not recommend Shaw's reappointment as chief of police and asked Livernois how she thought that they should handle this decision. Def. L.R. 56.1, Ex. EE at 28. Livernois thought about the issue through the holidays and then spoke again with Maholland, agreeing with his decision to not recommend the reappointment of Shaw.[2]

On February 17, 2003, Maholland informed the St. Charles City Council at an Executive Session that Shaw would not be reappointed as chief of police because of Shaw's poor performance, his failure to complete requested programs on a timely basis, and his failure to meet expectations.

---

[2]Shaw denies that the defendants' cited reference contains evidence of the date. *See* Shaw's response to Def. L.R. 56.1 at ¶ 221. The testimony, however, reveals that Maholland and Livernois spoke before the holidays, *i.e.*, Christmas and New Years, and then spoke again following the holidays. *See* Def. L.R. 56.1, Ex. EE at 28. While the cited reference did not explicitly state December 2002, the court finds that the testimony of Livernois fairly refers to December 2002.

Klinkhamer agreed with Maholland's recommendation to not reappoint Shaw. Maholland and Klinkhamer had spoken two or three weeks before the Executive Session about the decision not to recommend Shaw for reappointment. Shaw is the only department head for whom Maholland has not recommended reappointment. At the same meeting, Maholland told the aldermen that he would recommend the reappointment of Ellen Divita ("Divita"), the head of the St. Charles Department of Economic Development, despite concerns that were raised about Divita's performance.

The following day, February 18, 2003, Maholland notified Shaw that Shaw would not be recommended for reappointment as chief of police. Maholland had given Shaw no prior indication that he would not be recommended for reappointment. Maholland cited Shaw's survey results as a reason for the decision. Approximately ten days later, Klinkhamer called Shaw into her office and inquired as to whether he was considering litigation. She informed him that if he was considering litigation, she "would take [him] on." Def. L.R. 56.1, Ex. A at 122.[3] Maholland then called another

---

[3] In addition, Shaw testified during his deposition that Klinkhamer contacted him while the investigation into the Courser citation was on-going. Def. L.R. 56.1, Ex A at 228. The testimony did not indicate precisely when the conversation took place or the nature of the conversation. Shaw also included an affidavit as an exhibit to his Local Rule 56.1 Statement of Additional Facts in which he stated that Klinkhamer left a terse message on his voicemail at the police department requesting that Shaw return her call. Pl. L.R. 56.1 Add'l Facts, Ex. I. The affidavit further states:

> Upon reaching Defendant Klinkhamer at her City Hall office, she demanded that I stop the Courser citation investigation. When I told her that I could not, and would not, do so, she ordered me pursuant to her authority as Mayor to stop the investigation. During the conversation, I informed her of what the investigation had found so far regarding the circumstances surrounding the dismissal of the Courser citation. Following my explanation she again ordered me to stop the investigation and I again refused. I then engaged her in conversation regarding matters wholly separate to the Courser investigation.

*Id.* Shaw's affidavit raises this conversation for the first time, and the affidavit comes close to directly contradicting with Shaw's deposition testimony. In his deposition, Shaw was asked whether he thought the decision not to reappoint him involved anything other than the conversation of July 2002 regarding the Courser citation and his conversation regarding McNally's. Def. L.R. 56.1, Ex. A at 264. Shaw responded "no." *Id.*

It is well-settled that "a plaintiff cannot create an issue of material fact by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition" in order to withstand summary judgment. *Piscione* v. *Ernst & Young, LLP*, 171 F.3d 527 at 532 (7th Cir. 1999), citing *Darnell* v. *Target Stores*, 16

meeting with Shaw to reiterate the reasons for his decision not to recommend Shaw for reappointment. The reasons included the survey results and the listen and learn program results.

As of May 2002, Maholland intended to recommend Shaw's reappointment. Maholland became more involved in the police department, however, and developed the opinion that the police department was not performing up to his expectations. Maholland thought that Shaw made knee jerk decisions, had demonstrated poor analytical skills in some of his decisions, was autocratic, and was not inclusive in his decision-making. Def. L.R. 56.1, Ex. C at 101-02. Maholland also based his decision, in part, on Shaw's 2001/2002 performance evaluation, but his "primary motivation was much different than probably what was in the 2001-2002 [performance evaluation]." *Id.* at 39. Maholland believed that Shaw's results on the employee survey were not very good and that Shaw had lost the trust and confidence of the police officers. In addition, Maholland based his decision on Shaw's failure to calculate costs for a proposal allowing police officers to work four ten-hour shifts per week, his failure to indicate how additional training would be provided to the police officers pursuant to the proposal, and the problems created by the command structure implemented by Shaw. Maholland also considered Shaw's failure to provide him with all information necessary to resolve grievances, Shaw's business plan, and the presentation of a strategic department plan by two commanders rather than by Shaw while Shaw was on a leave of absence. Maholland maintains

---

F.3d 174, 176 (7th Cir. 1994). When a conflict exists between a plaintiff's own sworn affidavit and his own sworn deposition testimony, the deposition testimony overrides statements made in the affidavit. *Piscione*, 171 F.3d at 532. "When a 'deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.'"*Id.* at 532-33, quoting *Russell* v. *Acme-Evans Co.*, 51 F.3d 64 at 67-68 (7th Cir. 1995).

Shaw, however, does not argue that the conversation discussed in his affidavit caused or affected the decision not to reappoint him. In fact, other than mentioning it in his statement of facts, Shaw does not reference this conversation again. As a consequence, the court did not rely on the affidavit or deposition testimony in deciding this motion for summary judgment and it is not necessary for the court to strike the affidavit.

that the January 29, 2003 personnel order did not influence his decision and that he did not know the identity of Klinkhamer's campaign contributors, specifically the owners of McNally's or Courser, when he made his decision.

In May of 2003, Shaw was not reappointed as chief of police. He continued to serve as chief of police until his successor was appointed in September of 2003.

## ANALYSIS

### I. First Amendment Retaliation Claim

Shaw asserts that the defendants violated his constitutional rights by retaliating against him for exercising his First Amendment rights. In evaluating a First Amendment retaliation claim brought pursuant to § 1983, the court applies a three-step test premised on the Supreme Court's decisions in *Pickering* v. *Bd. of Educ.*, 391 U.S. 563, 568, 29 L. Ed. 2d 811, 88 S. Ct. 1731 (1968), and *Connick* v. *Myers*, 461 U.S. 138, 147, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983). *Cygan* v. *Wis. Dep't of Corr.*, 388 F.3d 1092, 1098 (7th Cir. 2004). First, the plaintiff must prove that his speech related to a matter of public concern. *Gustafson* v. *Jones*, 290 F.3d 895, 906 (7th Cir. 2002); *see also Connick*, 461 U.S. at 147. Second, the plaintiff must establish that his speech played a substantial part in the employer's decision to take an adverse employment action against him. *Gustafson*, 290 F.3d at 906. Third, the defendants have the opportunity to show that they would have taken the adverse action against the plaintiff even in the absence of his comments. *Cygan*, 388 F.3d at 1098. The determination of whether speech is constitutionally protected is a question of law for the court. *Sullivan* v. *Ramirez*, 360 F.3d 692 at 698 (7th Cir. 2004), citing *Kokkinis* v. *Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999).

## A.    Matter of Public Concern

"Whether a government employee's speech addresses a matter of public concern depends upon 'the content, form, and context of [the speech] as revealed by the whole record.'" *Gustafson*, 290 F.3d at 906-07, quoting *Connick*, 461 U.S. at 147-48. The content of the speech is the most important of these factors. *Id.* at 907, citing *Button* v. *Kibby-Brown*, 146 F.3d 526, 529 (7th Cir. 1998); *Marshall* v. *Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994); *Belk* v. *Town of Minocqua*, 858 F.2d 1258, 1264 (7th Cir. 1988). "The 'public concern' element is satisfied if the speech can fairly be said to relate to a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee." *Gustafson*, 209 F.3d at 907, citing *Connick*, 461 U.S. 138 at 146.

The speech at issue in the present matter consists of Shaw's statement to Maholland that the closure of McNally's on Thanksgiving showed "extreme favoritism," Shaw's statements to Maholland and Livernois that Klinkhamer requested that he pull Courser's ticket, Shaw's letter to Kane County State's Attorney Gorecki requesting that she advise him as to how the Courser citation was handled, Shaw's 1/29/03 Personnel Order that notified Maholland, among others, that Shaw had retained an attorney to investigate the dismissal of the Courser citation, and Shaw's letter to Major Joseph Gryz requesting that the ISP conduct a criminal investigation into an allegation that the Courser ticket was dismissed without the issuing officer's consent.[4] As the Seventh Circuit has noted, "Speech that accurately exposes official impropriety or corruption may certainly be described

---

[4]Defendants deny that they were aware of Shaw's letter to or contact with Gorecki. They also deny that they were aware of Shaw's letter to Major Gryz. In any event, these actions occurred after Maholland made the decision not to reappoint Shaw, and, as a logical consequence, could not have motivated Maholland's decision.

as highly critical of the official it targets, yet it has generally been accorded the highest level of First Amendment protection." *McGreal* v. *Ostrov*, 368 F.3d 657 at 679-680 (7th Cir. 2004).

The defendants dispute that Shaw's speech addressed a matter of public concern, claiming instead that Shaw spoke as an employee rather than as a citizen and never explicitly or implicitly accused any of the defendants of wrongdoing. "Speech which is made in all respects as part of an employee's job duties" does not fall within the ambit of protected speech. *Gonzalez* v. *City of Chicago*, 239 F.3d 939 at 942 (7th Cir. 2001). Further, "'[s]peech that relates primarily to ... internal office affairs, in which the individual speaks as an employee rather than as a citizen' is not protected by the First Amendment." *Id.*, quoting *Cahill* v. *O'Donnell*, 75 F. Supp. 2d 264 at 272 (S.D.N.Y. 1999). Nevertheless, "[s]peech on a matter of public concern does not become less so because it is communicated privately to one's superiors." *Hanania* v. *Loren-Maltese*, 319 F. Supp. 2d 814 at 828-29 (N.D. Ill. 2004), citing *Delgado* v. *Jones*, 282 F.3d 511 at 518 (7th Cir. 2002); *Givhan* v. *Western Line Consol. Sch. Dist.*, 429 U.S. 410, 415-16, 58 L. Ed. 2d 619, 99 S. Ct. 693 (1979).

While Shaw appears to have chosen his words carefully, never accusing anyone of misconduct directly, his speech expressed concern that Klinkhamer engaged in acts of favoritism to campaign contributors by improperly coming to their assistance when they ran afoul of the law. The court agrees with Shaw that a public official's misconduct and abuse of power relate to matters of public concern. *See Kinney* v. *Weaver*, 301 F.3d 253, 276 (7th Cir. 2002)(citation omitted)(speech regarding the misconduct of public officials, "especially when it concerns the operation of the police department," is of utmost First Amendment significance); *Myers* v. *Hasara*, 226 F.3d 821, 826 (7th Cir. 2000)(noting importance of public employees' right to "expose misdeeds and illegality in their departments"); *Glass* v. *Dachel*, 2 F.3d 733 at 741 (7th Cir. )("matters of public concern do include

16

speech aimed at uncovering wrongdoing or breaches of public trust"). Further, "[w]hether public officials are operating the government ethically and legally is a quintessential issue of public concern." *Greer* v. *Amesqua*, 212 F.3d 358 at 371 (7ᵗʰ Cir. 2000).

Defendants contend that Shaw did not make any accusations of wrongdoing before he was informed that he would not be reappointed. The record, however, does not support this contention. Shaw reported his concern that Klinkhamer showed extreme favoritism to McNally's to the city administrator, Maholland. He also informed Maholland that Klinkhamer asked him to pull Courser's ticket. Moreover, Shaw notified Maholland that he was conducting an investigation into the dismissal of Courser's ticket, which he described by its citation and complaint number rather than referencing Courser by name.[5] Acts of political favoritism that affect the ability of the police to uphold and enforce the law relate to matters of public concern. The court recognizes that Shaw never explicitly stated that he thought that Klinkhamer engaged in misconduct or unethical behavior, but, by raising these very issues to the city administrator, he was placing a city official and his superior on notice of questionable conduct on the part of the mayor. Considering the record as a whole as it must, the court finds that the content of Shaw's speech related to a matter of public concern.

Defendants rely on *Gonzalez* v. *City of Chicago*, 239 F.3d 939 (7ᵗʰ Cir. 2001), in support of their contention that Shaw's speech was not protected by the First Amendment because it was designed to inform Maholland of internal police affairs only. In *Gonzalez*, a former Chicago police officer filed suit against the city and three of his superiors alleging that he was terminated in retaliation for the reports he made as an investigator in the Office of Professional Standards. *Id.* at

_____

[5]Whether Maholland was aware that the personnel order involved Courser's citation, which he denies, is another matter.

17

940. The Seventh Circuit determined that while police misconduct was a matter of public concern, Gonzalez's reports were not protected because they were merely the result of his job duties. *Id.* at 942 ("Speech which is made in all respects as part of the employee's job duties is generally not protected expression of the public employee."). The Seventh Circuit also made clear that it was not "establishing a *per se* rule exempting statements made in the course of official duties from the protection of the First Amendment." *Id.*, quoting *Koch* v. *City of Hutchinson*, 847 F.2d 1436 (10th Cir. 1988)). The Seventh Circuit limited its holding to the routine discharge of employment responsibilities "where there is no suggestion of public motivation." *Id.* at 519.

The present matter, however, is distinguishable from *Gonzalez*. Unlike the police officer in *Gonzalez* whose job consisted of investigating and reporting misconduct of police officers, Shaw's job consisted of overseeing the police department. Although Shaw, as chief of police, had a duty to ensure that the police officers under his supervision enforced and upheld the law, his speech was not simply related to reports of potential misconduct on the part of police officers. His speech also included reports of potential misconduct on the part of the mayor, which cannot be said to fall within his normal job duties. Shaw's speech, instead, "went far beyond some rote, routine discharge of an assigned duty as in *Gonzalez*." *Delgado*, 282 F.3d at 519.

Defendants also contend that the Shaw's speech it not entitled to First Amendment protection because it was false and recklessly made. *See Greer*, 212 F.3d at 373 ("Recklessly false statements by a public employee enjoy no First Amendment protection"), citing *Brenner* v. *Brown*, 36 F.3d 18, 20 (7th Cir. 1994). In their reply, defendants acknowledge that Shaw's speech, as contained within the complaint, is not at issue for the determination of whether his speech was falsely or recklessly made. The speech at issue, instead, includes the statements made by Shaw prior to his removal as

chief of police. Defendants do not make any argument or cite to any authority supporting their contention that Shaw's speech prior to his removal was false or recklessly made. Rather, defendants reassert their argument that Shaw failed to make any accusations of wrongdoing before his non-reappointment, an argument the court addressed and rejected above. Generally, "a suggestion that statements were made with reckless indifference to their accuracy is not normally relevant to the question whether the issue was a matter of public concern. *McGreal*, 368 F.3d at 673, citing *Gustafson*, 290 F.3d at 908. At a minimum, whether Shaw's statements were false or recklessly made is an issue of material fact.

## B. The Defendants' Motive

Because Shaw demonstrated that his speech addressed a matter of public concern, he must prove that his speech played a substantial role in the defendants' decision to take an adverse employment action against him. *Gustafson*, 290 F.3d at 906. Shaw asserts that an inference of retaliatory motive exists because of the close temporal proximity between his speech and the announcement that he would not be reappointed as police chief. "[T]iming alone does not create a genuine issue as to pretext if the plaintiff is unable to prove, through other circumstantial evidence, that he was terminated for a reason other than that proffered by the employer." *Pugh* v. *City of Attica*, 259 F.3d 619 at 629 (7th Cir. 2001), citing *Foster* v. *Arthur Anderson, LLP*, 168 F.3d 1029 at 1035 (7th Cir. 1999).

The record reveals that Shaw reported Klinkhamer's request that he pull Courser's ticket to Maholland shortly after Klinkhamer made her request in July of 2002. He reported his concerns of the extreme favoritism shown to McNally's to Maholland in December of 2002. Shaw initiated the internal investigation of the Courser citation on January 29, 2003. The evidence further shows that

19

Maholland decided against recommending Shaw's reappointment in December of 2002. Maholland informed Shaw that he would not be recommended for reappointment on February 18, 2003. An inference of retaliatory motive is permissible when an adverse employment action follows on the heels of a protected activity. *See Filipovic v. K&R Express Systems, Inc.*, 176 F.3d 390, 398-99 (7th Cir. 1999). While the record shows Maholland made the decision not to recommend Shaw as chief of police shortly after Shaw brought the issue of McNally's to Maholland's attention, it is not clear how much time passed in between this conversation. In addition, a significant amount of time lapsed between Shaw's conversation with Maholland about Klinkhamer's request that Shaw pull Courser's ticket, which occurred in July or August of 2002, and Maholland's decision not to recommend Klinkhamer's reappointment, which occurred in December of 2002. This significant lapse in time makes it less likely Maholland took the conversation into consideration in his decision.

Moreover, even if the court were to find the close proximity in time between Maholland's and Shaw's conversation about McNally's and the internal investigation launched by Shaw in January of 2003 and the day on which Maholland informed the city council that he would not recommend Shaw's reappointment in February of 2003 as evidence of a retaliatory motive, Shaw still must present other evidence that gives reason to doubt the truthfulness of Maholland's stated reasons for not reappointing Shaw. *Pugh*, 259 F.3d at 629.

C.    *Pretext*

In the context of summary judgment, "[i]n order to reach a jury with a theory of First Amendment retaliation, [plaintiff] must show that a reasonable jury could conclude that [defendants'] stated, legitimate reason for his termination is a lie." *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007 at 1016 (7th Cir. 2004), citing *Vukadinovich v. Bd. of Sch. Trs.*, 278 F.3d 693, 699 (7th Cir.

2002). Defendants contend that Shaw was not reappointed based on the steady decrease in Shaw's performance evaluations during his tenure as chief of police, concerns over Shaw's decision-making ability and his ability to consider all relevant factors when making a decision, and Maholland's belief that the police department was not performing up to his expectations. Shaw, however, asserts that the real reason he was not reappointed as chief of police was because he reported his concerns about the Courser citation and McNally's and instigated investigations into the dismissal of the Courser citation. Shaw also points to his 2002 performance evaluation conducted nine months before Maholland notified him that he would not be reappointed. According to the evaluation, Shaw's overall performance exceeded expectations. In addition, Shaw maintains that he was never informed that his performance was unsatisfactory.

Shaw, however, does not refute the fact that his 2002 performance evaluation included criticism of his decision-making skills. The evaluation noted that Shaw did not gather input from all of the individuals involved in a decision before making a decision. Def. L.R. 56.1, Ex. CC at 195. The evaluation also reported that Shaw failed to follow through on some of Maholland's recommendations and that Shaw had demonstrated poor communication skills on occasion. Shaw also does not dispute that Maholland became more involved in the police department or that Maholland formed a belief that the police department was not meeting his expectations. In his deposition, Maholland testified that he thought that Shaw made knee jerk decisions, had demonstrated poor analytical skills in some of his decisions, was autocratic, and was not inclusive in his decision-making. Def. L.R. 56.1 at ¶ 191. In addition, Maholland considered the results of an employee survey and listen and learn sessions during which some of the officers expressed

concerns about the police department, including poor morale, office politics, and interpersonal issues, as well as the lack of direction of the police department.

Further, Shaw takes issue with the number of times that such complaints were made during the listen and learn sessions but does not dispute the existence of such complaints. Shaw offers no evidence demonstrating that such complaints were unfounded or that Maholland was unjustified in viewing Shaw's performance negatively in light of those complaints.

Shaw's evidence is principally his subjective belief that he was terminated because of his speech and not because of the reasons stated by Maholland. Subjective belief alone is not sufficient to withstand summary judgment. *See Vukadinovich*, 278 F.3d at 700, citing *Johnson* v. *Univ. of Wisconsin-Eau Claire*, 70 F.3d 469, 480 (7th Cir. 1995)(holding that plaintiff's "subjective belief that the action was retaliatory and that the claimed reasons were pretext does not alone create a genuine issue of material fact."). Other than his belief, he proffers the Courser speech and the McNally's speech. The evidence shows that he resisted Klinkhammer's demand that he pull Courser's ticket in June, 2002 and shortly thereafter he told Maholland that this had occurred. Everything else regarding this incident occurred after the decision not to renew the contract had been made. Concerning the McNally's incident, Klinkhammer told Shaw that she was displeased with the citation in August, 2002. In December, after the penalty of closing on Thanksgiving Day was imposed, Shaw told Maholland (mistakenly) that McNally's was even not open on Thanksgiving Day.

Finally, Shaw argues that the more favorable treatment of a similarly-situated department head is evidence of pretext. During the February 17, 2003 Executive Session, Maholland informed those present that he would not recommend the reappointment of Shaw as police chief. Maholland

also said that he would recommend the reappointment of Divita, a department head with acknowledged performance deficiencies, because he was able to address any issues with her but that he did not think he had the same ability in Shaw's case. Shaw asserts that the reappointment of Divita constitutes more favorable treatment and evidence of pretext.[6]

"There is no precise formula to determine whether an individual is similarly situated to comparators." *McDonald* v. *Vill. of Winnetka*, 371 F.3d 992 at 1002 (7th Cir. 2004), citing *Barrington Cove, LP* v. *R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001). Generally, whether individuals are similarly situated is a question of fact for the jury. *Id.* A court, however, "may properly grant summary judgment where it is clear that no reasonable jury could find that the singularly situated requirement has been met." *Id.* (citations omitted).

The Seventh Circuit in fact requires proof that "similarly situated individuals must be very similar indeed." *Id.*, citing *Purze* v. *Vill. of Winthrop Harbor*, 286 F.3d 452, 455-56 (7th Cir. 2002)(holding that in order to be considered "similarly situated," comparators must be *"prima facie* identical in all relevant respects"). In the employment context, the Seventh Circuit has required a plaintiff who claims that he was treated more harshly than others to show that he is "similarly situated to persons outside the protected class with respect to performance, qualifications, and conduct." *Id.*, quoting *Radue* v. *Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). Here, the only information that Shaw has provided concerning Divita is that Divita was the head of a city department and that members of the City Council were concerned about her performance. Shaw

---

[6]In their responses to Plaintiff's L.R. 56.1 Statement of Additional Facts, defendants raised hearsay objections to the statements contained in the February 17, 2003 Executive Session Minutes relating to what various aldermen said during the meeting concerning Divita. *See* Def. Resp. L.R. 56.1 at ¶¶ 188-190. "Hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible at trial." *Eisenstadt* v. *Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Shaw has not identified a single exception to the hearsay rule which would deem the statements admissible. Thus, the court did not consider such statements in deciding the defendants' motion for summary judgment.

failed to provide any further information showing how he and Divita were similarly situated. Shaw has given the court no information concerning Divita's actual performance inadequacies, whether such inadequacies were similar to Shaw's, her job responsibilities and functions, her qualifications, or whether her performance problems were correctable. Further, Shaw's subtext appears to be that Maholland responded to Klinkhammer's displeasure with Shaw by recommending the non-renewal of his contract. There is no evidence that might corroborate this implication demonstrating that Klinkhammer's favorable view of Divita was the decisive factor in retaining her in spite of Maholland's view of her performance problems.[7] As a consequence, Shaw cannot show that Divita was similarly situated for purposes of establishing pretext.

In the end, the issue is whether a reasonable jury, if it believed Shaw's version regarding the two comments to Maholland, would be sufficient to support a verdict in his favor in light of all the undisputed evidence on which Maholland said he relied. The court concludes that Shaw's evidence is within that "mere scintilla" range which is insufficient to create a genuine issue of material fact that Shaw's speech was the true reason for what Maholland decided to do. Defendants are therefore entitled to summary judgment on Shaw's claim of First Amendment retaliation.

## II.    Equal Protection Claim

Defendants argue that they are also entitled to summary judgment as to Shaw's equal protection claim. Since Shaw is the sole member of the class, his equal protection claim is rooted in the "class of one" cases stemming from the Supreme Court's decision in *Village of Willowbrook v.*

---

[7]There is some evidence that Klinkhammer did not particularly favor Divita but deferred to Maholland's judgment on the matter. Plaintiff has objected to the evidence on hearsay grounds and it is not considered even though it is probably not excluded by the hearsay rule. *See United States* v. *Montana*, 199 F.3d 947, 950 (7th Cir. 1999) ("Performative utterances are not within the scope of the hearsay rule, because they do not make any truth claims."). If the evidence were admitted, however, it would reinforce the court's view that the subtext is without evidentiary support.

*Olech*,528 U.S. 562, 145 L. Ed. 2d 1060, 120 S. Ct. 1073 (2000). In *Olech*, the Supreme Court held that "an individual who has not been singled out because of race or some other trigger of invidious discrimination can still obtain a remedy under the equal protection clause for 'irrational and wholly arbitrary' adverse treatment by government." *Tuffendsam* v. *Dearborn Cty. Bd. of Health*,385 F.3d 1124 at 1127 (7th Cir. 2004), quoting *Olech*, 528 U.S. at 565.

In order to establish a *prima facie* case of a class of one denial of equal protection, "the plaintiff must present evidence that the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." *Id.*, citing *Hilton* v. *City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000). Alternatively, a plaintiff may establish a class of one case "by showing that the defendant had intentionally treated the plaintiff differently from others similarly situated and had had no rational basis for doing so." *Id.*, citing *Indiana Land Co.* v. *City of Greenwood*, 378 F.3d 705, 713 (7th Cir. 2004); *Nevel* v. *Village of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002); *Albiero* v. *City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001).

Shaw maintains that he was the victim of a highly selective removal from office for purposes of his equal protection claim when compared with other department heads, namely Divita. The court agrees with Shaw that he is not obliged to find a department head who committed the same exact violations and yet was not removed for purposes of demonstrating that a person was similarly situated and treated differently. As the court discussed above, however, Shaw has made no showing as to the nature or degree of Divita's performance deficiencies. The court cannot determine that Divita was similarly situated to Shaw based on the mere assertion that Divita also had performance

deficiencies. Thus, Shaw cannot establish a *prima facie* case of denial of equal protection. The court grants summary judgment to the defendants on Shaw's equal protection claim.

## III.   Conspiracy

For his § 1983 claim of conspiracy, Shaw maintains that the defendants conspired to deprive him of his constitutional rights by failing to reappoint him in retaliation for his protected speech. In order to state a conspiracy claim under § 1983, a plaintiff must show "(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in the furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437 at 442 (7th Cir. 1988), cert. denied 486 U.S. 1043, 100 L. Ed. 2d 620, 108 S. Ct. 2035 (1988)

There is some confusion over the evidence offered in support of Shaw's conspiracy claim. While recognizing the Shaw's complaint asserts that defendants conspired to deprive him of his constitutional rights, defendants point to Shaw's deposition testimony that more or less claims that the defendants conspired with a columnist for a local newspaper to defame him. Shaw argues that the defendants' narrow portrayal of his conspiracy claim ignores the bigger issue, *i.e.*, the failure of the defendants to reappoint Shaw in retaliation for exercising his First Amendment rights. Even assuming that Shaw presented adequate circumstantial evidence of an agreement between the defendants not to reappoint Shaw as chief of police, based on its prior analysis of Shaw's claims of First Amendment retaliation and denial of equal protection, the court concludes that Shaw cannot show that his non-reappointment deprived him of his constitutional rights. *See, e.g., Goetzke v. Ferro Corp.*, 280 F.3d 766 at (7th Cir. 2002)(plaintiff failed to establish that defendants engaged in

the unlawful activity of retaliatory discharge, thereby foreclosing plaintiff's claim of civil conspiracy). Accordingly, summary judgment is granted as to Shaw's conspiracy claim.

## IV.     Claims Conceded

Shaw concedes that defendants are entitled to summary judgment as to his Due Process claim (count II). Shaw further concedes that defendants are entitled to immunity as to his state law claim of retaliatory discharge in count V and, as a result, his related claim of respondeat superior in count VI. In addition, in light of the court's granting of defendants' motion for summary judgment on all of Shaw's claims, the City of St. Charles cannot be held liable for any tort judgment under count VII. Thus, the court grants summary judgment to defendants as to count II, count V, count VI, and count VII.

## CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment [#28] is granted. The clerk is instructed to enter judgment in favor of the defendant. All future dates, including the January 5, 2005 trial date, are stricken. This case is terminated.


Enter: *Joan H. Lefkow*
          JOAN HUMPHREY LEFKOW
          United States District Judge


Date: December 22, 2004